

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-15-00227-CR

FRED MOORE                                                      APPELLANT

V.

THE STATE OF TEXAS                                                   STATE

----------

FROM COUNTY CRIMINAL COURT NO. 2 OF DENTON COUNTY
TRIAL COURT NO. CR-2014-06840-A

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant Fred Moore appeals his conviction for Class A misdemeanor assault with an affirmative finding of family violence. *See* Tex. Penal Code Ann. § 22.01(a) (West Supp. 2015) (setting forth elements of assault); Tex. Code Crim. Proc. Ann. art. 42.013 (West 2006) (setting forth when a finding of family

---

[1]*See* Tex. R. App. P. 47.4.

violence shall be made).  In two issues, Moore argues that the trial court erred by admitting the audio recording of a 911 call and by denying his motion for directed verdict.  We will affirm.

## II. BACKGROUND

Jennifer Dooley, a 911 dispatcher with the Denton Police Department, testified that she received a call on April 26, 2014, regarding an assault in progress.  The caller said that a black male had grabbed a black female by the face, had hit her in the face, and had dragged her across the street.  The caller said that this incident occurred near Taliaferro Street.  Dooley testified that the caller was relaying information about the altercation as she was seeing it.  Over objection, the recording of this 911 call was admitted into evidence as State's Exhibit 1 and was played for the jury.[2]

Nancy Wimberley also witnessed the incident and also made a call to 911 because the woman looked like she was in distress and needed help.  Wimberley testified that she had just left a home after providing care for a disabled client when she saw a struggle between a man and a woman that was occurring approximately six feet from her as she traveled on Taliaferro Street.  Wimberley said that the two were arguing, though she could not hear the words; that the man was holding the woman's wrists against her will; and that the woman was trying to get away.  The 911 dispatcher asked Wimberley if the man was wearing

---

[2]The caller from this 911 call did not testify at the trial.

a blue shirt and the woman was wearing a purple shirt. Wimberley confirmed that they were, and the 911 dispatcher told Wimberley that help was already on the way. Over objection, this second 911 call was admitted into evidence as State's Exhibit 2 and was played for the jury.[3]

Officer Alfonso Orozco with the Denton Police Department testified that he responded to a call for an assault in progress in the 2200 block of North Elm on April 26, 2014. When he arrived, there were not a lot of people on the sidewalk or in the street in that area, so he was able to quickly identify the black male wearing a blue shirt and the black female wearing a purple shirt. Officer Orozco testified that he yelled at the female, who was leaving the scene, to come back but that she ignored him and kept walking. Officer Orozco spoke with the black male, whose license identified him as Frederick Lafon Moore II, and noted that he was "pretty angry, agitated." When Officer Orozco informed Moore that the police had received a call that Moore had assaulted a female, he denied having assaulted the female and said that he had been harassed and assaulted by the female, who was later identified as Kayla Chambers.

Officer Orozco testified that Chambers was arrested on an outstanding warrant and was taken to jail. Photographs taken of Chambers at the jail revealed that she had scratches on her face and neck and some scuff marks on

---

[3]Relevant transcriptions of the 911 calls are set forth in the analysis of Chambers's second issue and demonstrate that the first 911 call provided more details and information than the second 911 call.

her lower legs by her ankles. Officer Orozco opined that the scuff marks near Chambers's ankles were made by the concrete as witnesses saw Moore dragging Chambers and that the scratches on Chambers's neck had resulted from Moore's pulling Chambers's shirt and collar, scratching the side and back of her neck. Officer Orozco was not sure what had caused the scratch on Chambers's cheek but opined that it was a fingernail scratch.

Officer Orozco testified that the scratches were red and were not scabbed over and that, based on his experience, they had been made within an hour. Based on the totality of the circumstances—including the information he had received from the 911 callers that Chambers had been punched and a slapped, Moore's emotional state, the fact that Chambers was walking away from Moore, and Chambers's injuries—Officer Orozco concluded that an assault causing bodily injury had occurred.

Chambers, who described herself as Moore's girlfriend, testified that she had been in a relationship with Moore for several years and that they were living together on April 26, 2014. Chambers said that around 4:00 p.m. on April 26, 2014, she and Moore were on the way to the grocery store and were discussing how much money they had available to spend. She said that they do not own a vehicle, that it was hot, and that it was too much trouble to carry groceries back home. Moore told her that his sister was going to pick them up from the grocery store and take them home. Chambers testified that she did not have a disagreement or an argument with Moore and that the only words they

4

exchanged that could be construed as arguing were that she did not want to have to walk back home with the groceries. Chambers testified that Moore did not strike, slap, or punch her while they were outside talking about their finances, nor did he put his hands around her neck. Chambers said that when the police arrived, Moore told her to go ahead and go to the grocery store and that he would meet her there; she said he then walked back across the street.

Chambers said that she started walking toward the grocery store, and when she came to the end of the street, she was approached by a police officer. The officer told her that she fit the description of a woman whom a 911 caller had seen being assaulted. Chambers told the officer that she had not been assaulted and that she did not understand why he had approached her.[4]

Officer James Bolin testified that he arrived on the scene of the incident and made contact with a female who was walking away. Officer Bolin testified that the female was wearing a purple shirt and was crying. Officer Bolin asked if she was okay and what had happened; the female said that she was fine and that nothing had happened. Officer Bolin testified that the female's response did not make sense to him at the time because he could see that the female had a scratch in the area of her right tricep and had a scratch on her cheek. Officer Bolin asked the female, who identified herself as Chambers, if she had been hit, and she said no. As Officer Bolin continued to talk with Chambers, she said that

---

[4]Officer Orozco testified that it is common for the complainant in a domestic-violence incident to say that no assault had occurred.

she and her boyfriend—she then clarified that he was her ex-boyfriend—had gotten into an argument or an altercation but that nothing had happened. Chambers later alluded to the fact that her ex-boyfriend had "pulled" her and that she had possibly received one of the scratches as a result. Officer Bolin testified that he was in contact with Officer Orozco and informed him that Chambers had scratches that appeared to be fresh and that appeared to be from an assault. Officer Bolin testified that Chambers's injuries were consistent with an assault causing bodily injury.

During Moore's case in chief, he re-called Chambers to the stand. She said that she never told Officer Bolin that Moore had pulled her, that she did not refer to Moore as her ex-boyfriend, and that she was not crying when Officer Bolin approached her. Chambers testified that the scratches were caused by having rough sex with Moore before they went to the grocery store and that the marks on her legs were caused by leaning against a tree while she and Moore were discussing their finances. Chambers testified that any reference she may have made regarding an altercation was related to her discussion with Moore about how she did not want to carry groceries back home from the store. Chambers testified that once the officer stopped her, she knew she was going to jail due to an outstanding warrant, and she was upset because she did not want to miss work. Chambers testified that she did not know why the 911 callers had assumed that she was being assaulted but said that Moore becomes animated

6

and uses hand motions when he talks. Chambers reiterated that Moore never grabbed or pulled her and that he never dragged her.

After hearing the above evidence, the jury found Moore guilty of assault as charged in the information and assessed his punishment at 365 days in jail. *See* Tex. Penal Code Ann. § 12.21 (West 2011). The jury also found that Moore and the victim were family members or members of the same household at the time of the offense and that Moore had never been convicted of a felony; the jury recommended that the sentence be suspended and that Moore be placed on community supervision. The trial court sentenced Moore in accordance with the jury's recommendation, suspended imposition of the sentence, and placed Moore on community supervision for twenty-four months. Moore perfected this appeal.

### III. TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING THE RECORDING OF THE 911 CALL

In his first issue, Moore argues that the trial court abused its discretion by admitting the recording of the 911 call as State's Exhibit 1 through the 911 dispatcher because it was not properly authenticated. Moore contends that the 911 dispatcher lacked knowledge as to the manner of operation and the recording of the 911 call and was unable to provide any evidence that the call was not modified or otherwise tampered with, despite that "the 'call' was not a single file" but had been made into five files and that there was no "proper basis or explanation for the missing portions."

We review a trial court's decision to admit evidence under an abuse-of-discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Lagrone v. State*, 942 S.W.2d 602, 613 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997). As long as the trial court's ruling falls within the zone of reasonable disagreement, we will affirm the trial court's decision. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 2966 (2011); *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

Texas Rule of Evidence 901 governs the authentication of electronic recordings. Tex. R. Evid. 901; *Leos v. State*, 883 S.W.2d 209, 211–12 (Tex. Crim. App. 1994). The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Tex. R. Evid. 901(a). Rule 901(b) provides a nonexclusive list of methods for authenticating evidence. Tex. R. Evid. 901(b). Relevant to the present case are the following provisions of rule 901(b):

> (1) **Testimony of Witness With Knowledge.** Testimony that an item is what it is claimed to be.
>
> . . . .
>
> (4) **Distinctive Characteristics and the Like.** The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.
>
> (5) **Opinion About a Voice.** An opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic

8

transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker.

Tex. R. Evid. 901(b)(1), (4), (5). The preliminary question for the trial court to decide is whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence proffered is authentic. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012).

During the trial, Dooley, a 911 dispatcher with the Denton Police Department, explained that on April 26, 2014, she was assigned an off channel so that she had direct communication with the officers that were responding to the assault in progress. Dooley listened to State's Exhibit 1, which contained five audio files; marked her initials on it; and testified that it was a fair and accurate recording of the conversation between her and the 911 caller. Dooley testified that the City of Denton has equipment capable of making recordings, that it makes fair and accurate recordings of the 911 calls that come in, and that the equipment was working on the date in question. Dooley testified that to the best of her knowledge, no additions or deletions were made to the substance of the 911 call. When the defense took Dooley on voir dire, she explained that the recording of the 911 call was separated into five audio files in order to omit the radio traffic recorded during the call. Dooley testified that even though the call was split into five parts to omit the radio traffic, taken together, the five parts were fair and accurate recordings of the entire conversation that took place between her and the 911 caller.

9

As set forth above, Dooley's testimony demonstrates that the five audio files comprising State's Exhibit 1 merely had the background noise from the radio traffic removed and that they accurately portrayed the substance of the original 911 call, to which Dooley was a witness with knowledge. *See* Tex. R. Evid. 901(b)(1); *see also Tienda*, 358 S.W.3d at 638. Additionally, because Dooley took the call, she was qualified to identify the voices on State's Exhibit 1 as those of the caller and herself. *See* Tex. R. Evid. 901(b)(5). Moreover, the content of the recording and the circumstances under which it was made—a 911 call from a witness reporting an assault in progress—support its authenticity. *See* Tex. R. Evid. 901(b)(4). State's Exhibit 1 was thus properly authenticated under rule 901 by the 911 dispatcher because her testimony demonstrated that the exhibit was what the State claimed it to be. *See* Tex. R. Evid. 901(a). Although Moore points to the fact that Dooley did not know how the recording equipment worked, such knowledge is not required to authenticate a recording of a 911 call. *See, e.g.*, *Chatman v. State*, No. 11-10-00044-CR, 2011 WL 3860437, at *4 (Tex. App.—Eastland Aug. 31, 2011, no pet.) (mem. op., not designated for publication) ("Inasmuch as the evidence is sufficient to show that the recordings are what the State represents them to be, we hold there is no requirement for testimony from a representative of the company that operates the system for the county involved.").

We therefore hold that the trial court did not abuse its discretion by admitting State's Exhibit 1. *See Tienda*, 358 S.W.3d at 638 ("If the trial court's

ruling that a jury could reasonably find proffered evidence authentic is at least 'within the zone of reasonable disagreement,' a reviewing court should not interfere."); *Angleton v. State*, 971 S.W.2d 65, 67–69 (Tex. Crim. App. 1998) (holding that enhanced copy of audio tape, in which background noise had been reduced to make voices more audible, was properly authenticated by officer who had listened to both original and enhanced versions of the tape and testified that enhanced tape was accurate copy of relevant contents of original). We overrule Moore's first issue.

## IV. TRIAL COURT DID NOT ERR BY DENYING MOORE'S MOTION FOR DIRECTED VERDICT

In his second issue, Moore argues that the trial court erred by denying his motion for directed verdict. Moore argues that there was no evidence identifying him as the "black male" from the 911 call who was alleged to have committed the assault of the unidentified "black female."

The standard of review applicable to a motion for directed verdict is the same used under a sufficiency review. *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App.), *cert. denied*, 522 U.S. 844 (1997); *Havard v. State*, 800 S.W.2d 195, 199 (Tex. Crim. App. 1989). In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014).

When performing an evidentiary sufficiency review, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Dobbs*, 434 S.W.3d at 170; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Moreover, we must consider all the evidence admitted at trial—even improperly admitted evidence, including hearsay—when performing a sufficiency review. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Poindexter v. State*, 153 S.W.3d 402, 406–09 (Tex. Crim. App. 2005).

A person commits the offense of assault if the person intentionally, knowingly, or recklessly causes bodily injury to another. *See* Tex. Penal Code Ann. § 22.01(a). Identification of the defendant as the person who committed the offense charged is an element of the offense that the State must prove beyond a reasonable doubt. *See Miller v. State*, 667 S.W.2d 773, 775 (Tex. Crim. App. 1984); *McCullen v. State*, 372 S.W.2d 693, 695 (Tex. Crim. App. 1963).

12

Because Moore challenges the sufficiency of the evidence only as it relates to identity, we will focus our analysis on the evidence linking him to the assault.

Here, the jury heard the audio recording of the initial 911 call, during which the caller described the action taking place in front of her:

> At 2219 North Elm Street, there's a man beating a woman in the middle of the street. . . . At the corner of Taliaferro. . . . It's a black man and a black woman, and he's beating the crap out of her in the street. . . . The black male has a blue shirt, blue jeans, and short hair. . . . The female has a purple shirt and orange underneath it and a pair of blue jeans on with [] sandals. . . . They're standing at the corner, and he's yanking on her, pulling her. She doesn't want to go with him. . . . He's slapping her around and hitting her with his [closed] fist. He's yanking on her, grabbing her by the neck. . . . He's grabbing at her arms, yanking her [and] trying to get control over her. . . . Well, she's standing in front of our yard, and he's yelling at her. He's trying to cross the street over to those [] rundown apartments, but he's [] stopped. Now he's just talking at her. He's trying to yank her across the street. . . . He's just yelling at her right now. It's getting more and more intense. Okay, now he's grabbing her in the face. Okay, he slapped her in the face. . . . Okay, he's just yelling at her and yelling at her, and she's just backing up against [] and hanging onto a pole—the stop sign. She's hanging onto the pole because she doesn't want to be drug [sic] away. He's screaming at her and yelling at her. She's still hanging onto the pole. . . . The man saw the police officer and took off. . . . He's heading toward the Cobblestone Apartments across the street. . . . The police officer's got him. . . . He's got the male. . . . [The police officer's] talking to him.[5]

Additionally, Wimberley, a passerby, also witnessed the altercation and called 911. She testified at trial, and the jury heard her 911 call, which was admitted into evidence and included the following:

---

[5]The preceding transcription of State's Exhibit 1, as well as the transcription of State's Exhibit 2 *infra*, was performed by the undersigned author after listening to the exhibits multiple times.

13

> We're in a vehicle, and we just passed two individuals—a man and a woman, both black. And the man was . . . very . . . argumentative with the woman, and she was . . . crying. It just looked like it might need some attention. They were standing on the Taliaferro corner of Elm. . . . He was screaming and arguing, and she's standing there crying. And they're just there on the street corner. . . .

The 911 dispatcher asked Wimberley if the man was wearing a blue shirt and if the woman was wearing a purple shirt, and she confirmed these details.

When the police arrived, they were able to identify the individuals involved in the altercation based on the 911 callers' descriptions and based on the sparse pedestrian traffic in the area; Moore's physical appearance and emotional state matched the descriptions given by the 911 callers. Moreover, the initial 911 caller stayed on the phone with the 911 dispatcher until police arrived and confirmed that the police had stopped the same black man whom she had observed involved in the altercation. Furthermore, Chambers ultimately admitted that Moore—not an unidentified individual—had pulled her.

Viewing all of the evidence in the light most favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that Moore was the black male described by the two 911 callers who saw Moore intentionally, knowingly, or recklessly cause bodily injury to Chambers. *See* Tex. Penal Code Ann. § 22.01(a); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789 (setting forth sufficiency standard); *Orellana v. State*, 381 S.W.3d 645, 653–54 (Tex. App.—San Antonio 2012, pet. ref'd) (holding circumstantial evidence sufficient to show that appellant was the perpetrator of the offense); *Nicholson v. State*, 162 S.W.3d

14

389, 396–97 (Tex. App.—Beaumont 2005, pet. ref'd) (same).  Accordingly, we hold that the evidence is sufficient to support Moore's conviction for Class A misdemeanor assault and that the trial court therefore did not err by denying Moore's motion for directed verdict.  We overrule Moore's second issue.

## V.  CONCLUSION

Having overruled Moore's two issues, we affirm the trial court's judgment.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  January 21, 2016